Good morning. May it please the Court. Good morning. I'm Ram Sanshino, appearing for the petitioner. If I may reserve three minutes of rebuttal time, please. Your Honours, this Court should overturn the BIA's affirmance of the IJ's reasoning and his credibility finding because the adverse credibility finding of the IJ did not meet the substantial evidence standard put forth by this Court. Neither were his findings specific and cogent. It is true the IJ listed a shopping list of things that he found objectionable with the petitioner and his case, but none of those were specific and cogent relating to the claim. Well, it seems that the IJ found your client's story implausible, but how does that relate to our end? And frankly, it is always, you know, having been a trial judge previously and you see people, a lot of times there are people that you're sure are lying for any number of reasons, but if you don't list them correctly, then they're up on, you know, we have to, our case law in the Ninth Circuit, you know, the issue is, you know, how much deference do we give to the IJ on this, or can we pick and parse and say, well, this one isn't, you know, doesn't necessarily go to the heart of the claim or it's based on speculation and then I'll, I mean, this is a classic case of, I think the IJ clearly didn't believe your client, found your client's story implausible for whatever reason, but, you know, is it, if at the end of the day, if we find that the reasons are either speculative or maybe, you know, don't go to the heart of the claim, do we just vacate the credibility finding and then send it back, or is he entitled to a finding of, but he is credible? Your Honor, I would. When he doesn't really, I mean, it's not, the case isn't really strong for him that way, you know, it doesn't jump out and you don't say, boy, this is, you know, in my mind, boy, this is really a credible story, but then on the other hand, I'm trying to appreciate your arguments on some of the things do seem like the IJ's saying, well, I don't think it would have happened that way, or I don't see, you know, if the father should have done something different, I don't think a father would have behaved that way. I would entirely agree with you, Your Honor. It's kind of a slippery story here. I don't know, I wouldn't agree that the story is slippery, Your Honor. I think the story is, for example, completely analogous to Bandari v. INS that this Court handled maybe 9, 10 years ago, and the fact pattern almost analogous, the interfaith dating, but nevertheless, to address Your Honor's point. See, I don't find it compelling, but I understand what you're saying about the, that some of the reasons do appear to be speculative. I think, I'm sorry, did Your Honor? Go ahead. I think procedural due process, Your Honor, essentially requires that this IJ, if he had doubts or questions of credibility, if he had any question, as I cited in my brief, and I did also before the Board, almost every item that the IJ listed to find Mr. Youssef not credible were things that he had in his mind, that he postulated for the first time in his oral decision. There can be no procedural fairness in that, Your Honor. He brought up the question of the passport, the question of the minister not being present, not having testified in court. He brought up the question of the intensity of the torture and whether that would have been enough, it should have lasted an hour, and whether that would have been enough to sustain the kind of injuries that the petitioner was stating. Well, let's just take that one, because I stopped on that and said, huh? Because petitioner's story is he's beaten by four adults with chains for over an hour. But what ill effects did he suffer? He sought no medical treatment. I think it was his mother helped him with ice or something. He had a few bruises. But if you're beaten with chains for an hour, this is what he's claiming is persecution. That sounds like serious business. And if you emerge with a few bruises and that's it and don't seek any kind of medical treatment, doesn't that cause you to pause and say, huh? How did that happen? Never heard of anybody beaten with chains for an hour that has no more ill effects than that? Firstly, Your Honor, that part of the declaration, I believe Mr. Youssef was stating that he was being he was fleeing from the perpetrators in the streets. And so the I think the IG kind of took that out of context when he said that he was being beaten with chains for one hour. And yet he came out almost unscathed. And also addressing that point, Your Honor, are we to blame an applicant for asylum simply because he managed to escape severe consequences? I would suggest he probably wasn't beaten for an hour because you're beaten for an hour. You come out with more serious injuries than that. And that suggests that, well, maybe his story has been embroidered upon or exaggerated in order to further his claim and make it sound more like persecution. This is a credibility issue. And does that make a whole lot of sense? I think that's a question the IG is trying to ask himself. And it didn't make a whole lot of sense to him. Why does it make a whole lot of sense to you? Your Honor, respectfully, I would submit if it didn't make sense to the IG, the time to state that would have been in the evidentiary portion of the hearing. Not leaving it in the oral decision where evidentiary part of the hearing had been closed. There was no opportunity for counsel to ask for continuance to provide medical evidence. Well, this isn't a surprise. I mean, Petitioner himself is testifying to that. And I don't know that our case law, I mean, our case law certainly says you can't catch somebody by surprise. But if somebody tells a story, I don't know that the law requires you to stop and make sure he has a good explanation for every time there's a question. If somebody tells a howler, it's a howler. And it shouldn't be real hard for the Petitioner to figure out, or the Petitioner's counsel or whoever is guiding the Petitioner, to figure out that maybe some more explanation is in order. And if it's not offered up, it's not unusual for the judge at the end of the case to make a determination about credibility. And if the credibility determination is I don't believe what you said, what more is to be required? Again, Your Honor, that may well be. I mean, there may be situations where people do lie in asylum applications. It's been known to happen. That does happen. However, I don't think that that is the issue at bar today. The issue at bar is can Petitioners be held to such a high or an asylum applicant be held to such a high standard to have to actually go into the mind of what the immigration judge is thinking? And also, I would like to go back to what Judge Callahan was saying, that sometimes it's real difficult for the trier of fact to determine what part of it is true, what part of it isn't true. I agree with Your Honor. I think that this immigration judge just didn't like this case. I don't think that he found it believable from the get-go. And I think evidence of that is in the oral decision, because on page 7, the I.J. says, it strains credulity to believe that a 16-year-old kid, and that's the word he uses, would be accused of creating sectarian strife. There's a real procedural problem with that. Again, the procedural due process argument that Petitioner brought up before the Board and brings up, renews here before this Honorable Court, is a real important issue that the Court should take note of. I don't think that it can ever be fair for a judge to characterize evidence like that and to bring it down to sort of a lack of serious level, because I think that states something about what his thoughts and beliefs are about that claim. If I may rest, because I believe I'm into my rebuttal time. You may reserve the balance. Thank you. And we'll hear from the Attorney General. Thank you. May it please the Court. My name is Luis Perez. I represent the Attorney General on this matter. The immigration judge had reason to question Mr. Yousef's testimony. Particularly, he didn't believe Mr. Yousef's claim that he was detained by the security forces and that he was detained with iron chains by four men. And the immigration judge did provide specific reasons. Now, as we noted in our brief, this Court's decision in Lee v. Wann states that the immigration judge only needs one basis. Your Honor. The Court only needs one basis, that is, supported by substantial evidence, to support the immigration judge's adverse credibility finding. Counsel, let me jump in and ask you a question. I'll tell you what's bothering me about this case. In the blue brief, for example, on page 8, counsel makes the argument, and I'll quote, additionally, the IJA must give the petitioner a fair opportunity to explain any perceived discrepancy, citing Chen v. Ashcroft. We also have another case, the Campos Sanchez case, that seems to say the same thing. Quote, the BIA must provide petitioner with a reasonable opportunity to offer an explanation of any perceived inconsistencies that form the basis for a denial of asylum. That's, as I said, Campos Sanchez. So one of the claims here is, okay, there may be all of this information that looks like it's inconsistent, but the Ninth Circuit requires that a defendant be given an opportunity to explain all of that. And I read that blue brief, and I was looking in your red brief for some answer to this, and I found no reference at all to this issue in your red brief. Maybe I missed it. But what's your answer to the Ninth Circuit's requirement that he be given an opportunity to explain, and he wasn't? That he was given the opportunity to explain, Your Honor. Where is that? Sure. First, it's in the transcript, Your Honor. Where, where, where? Sure. Let's go to page 73 to 75 in the administrative record. The I.J. asks or tells Petitioner, it doesn't seem like that would take them an hour to ask you three questions, sir. Now, that is in relation to Petitioner's testimony that during his first beating during detention, it took one hour for the security forces to ask him three questions, to beat him with sticks, and to accuse him of creating sectarian strikes. So the I.J. there told Petitioner that he was concerned about that testimony. Then Petitioner's response was there were, and this is on page 75, there were other, there were other questions like little things that I don't remember. That doesn't really address the immigration judge's concern. He was testifying that for one hour he was asked three questions, essentially three questions, you know, when did you meet this lady? When, you know, are you going to stop meeting with her? What did you do with her? And, again, you know, the beatings with wooden sticks. The I.J. took pause of that, and essentially let Petitioner know that he had a problem with that testimony. Then with respect to the extent of the injuries, both during the beating or the alleged beating with iron chain, the immigration judge relied on Petitioner's direct testimony, which was very clear as to the extent of his injuries. He testified on page 85 of the administrative record that he just received bruises on his legs and knees and that he did not require medical treatment. Then the I.J., again on page 86, asked him after Petitioner had already testified as to that, do you receive any medical treatment for your injuries? On page 87, no, my mother would put some pads on my bruises. Let me ask you about that one in particular because, I mean, I've already indicated it. It was part of the testimony that concerned me, but then you encounter our Court's precedent in Bondari, which seems to say in a not dissimilar case, the I.J. had concluded that he found it completely and wholly implausible the respondent would have been beaten for a period of 20 minutes with a rubber hose and not bleed. This simply is incredible and implausible to this Court, so it's the basis for the adverse credibility determination. And our Court says you can't base the credibility, adverse credibility determination on that because it's based on the I.J.'s own speculation as to what the medical consequences would be. Isn't that exactly the same thing that we've got here? I think what the Court is saying in Bondari is you cannot take your own subjective view of the world and sort of impose that view on a credibility determination. And in that case, Bondari, all that the I.J. was saying is when does a person bleed? That's kind of subjective. Well, but here it's when do you have to go to the doctor, you know? Or here it's why doesn't a father, why would a father behave the way that he's saying his father behaved? And, I mean, I think any of us that have children know that all parents don't parent similarly. Or how could a 16-year-old in an incident cause this sort of strife in a country? Aren't those all those type of things? I mean, the Court has decided. I don't think it could happen the way that you said it would happen. Well, let me just put it like this, Your Honor. As I said in the beginning, I don't think the Court in Bondari said that the immigration judge can never draw an inference because if that were the case, then the immigration judge is in a less advantageous position than a jury to make a finding of fact. I think the question is whether the immigration judge's inference was an inference that a reasonable adjudicator, not the subjective immigration judge in a particular case, but whether a reasonable adjudicator can reach that determination. Well, could a reasonable adjudicator, the judgments that the IJ made about the father, how a parent would behave, would that be a proper basis to support the credibility finding? I admit that the finding as to the father is not as strong as the finding as the beatings with the iron chains and the detention. And that's why I started my argument pointing out the Court's case law, that you only need one basis that is supported by substantial evidence to uphold the immigration judge's finding. I appreciate the realism. Could you identify for us what, in your view, is the basis or are the bases that we should focus on to see if they can be sustained? Again, at the end of his decision, I think it's on page 47 and 48, the immigration judge sort of summed up the adverse credibility finding and said, I don't believe your claim that you were detained and that you were beaten with iron chains. And obviously he listed sort of eight reasons for that, and I believe that reason number six and eight are probably the strongest reasons because those are the reasons that I believe would be reasons that a reasonable adjudicator could reach. And the distinction that the government is making with Bhandari is that all that Bhandari says is that in that case, the Court found based on the record, and I don't have the record in Bhandari to say whether it's the same case or not, but in that record, the Court found, well, this is the immigration judge's subjective view. But here, the immigration judge's conclusion is supported by Petitioner's clear and direct testimony. And on the basis of that substantial evidence, the immigration judge did make a reasonable inference, an inference that we contend would be made by a reasonable adjudicator. Well, what about the due process claims that Petitioner's making from this standpoint? I think that the IJ faulted Mr. Yusuf for the following. He has been able to produce no record of being arrested or detained or summons having been issued for the alleged court date. There is no minister that has appeared to verify that he is an evangelical Christian practicing here in the United States. There is no letter from his girlfriend or former girlfriend, Iman, to verify that he has stated as being true. Did he have – did he first hear about that in the oral ruling, or did he have an opportunity to do that? He did have an opportunity to do that, Your Honor. Let me make a quick look at my notes. If you go to page 109 of the administrative record, during corroboration, the government attorney asked Petitioner, why didn't you ask the pastor of the Egyptian church who provided you with a statement to mention Iman, your girlfriend? I mean, he was the one who allegedly helped you proselytizing her, yet there's no mention of her. And he was given the opportunity to explain that. Then – my time is up, Your Honor. Go ahead and finish your sentence. Then, finally, Your Honor, I would point to the colloquy on page 110 and 111 of the administrative record, where the immigration judge essentially tells him why you didn't ask something from Iman when you had her phone number. Even though you were in the United States, you had, according to your own personal testimony, a means to communicate with her. So that is distinguishable from what this Court found in Sidhu, where it's very difficult for someone to get information from someone in a foreign country. In this case, there was a means to do that. And it's there in the testimony. I invite the Court to look at that particular colloquy. It's page 110, 111 of the administrative record. Thank you very much. Thank you. Rebuttal. May it please the Court. Your Honors, this I.J. did not have a good, clear grasp of the situation in Egypt. This I.J. would have the applicants' families talk with Iman's parents about the basis of the relationship of their children. This is as taboo as if Mr. Yusuf went to his parents in Egypt and said, Mom, Dad, I'm a homosexual. Interfaith relationships are taboo in Egypt. For the judge to ask the applicant to provide some sort of evidence from Iman, which, by the way, the applicant had already stated on the record that he had no more relation or no more contact with his girlfriend after the October 2002 incident, is unrealistic. This is the same I.J. that, in view of the abundance of evidence of the kind of Muslim fundamentalism that exists in Egypt, stated that Egypt is a relatively tolerant country. And, again, with many quotations from sources outside of the State Department country reports, which are part of this administrative record, but also the State Department country report, which tends to be usually biased in favor of the Egyptian government, there still is an abundance of evidence that Egypt is nothing close to a tolerant government or tolerant society of its minorities. So this I.J. was clearly engaging in conjecture and speculation in his assessment about country conditions in Egypt, but more so also with the facts that were put forth by this applicant in this case. Counsel, let me explore what I was talking about earlier. One of your arguments was that he wasn't given an opportunity to explain. When I asked Mr. Parris about that, he directed us to parts of the transcript, the showing where he was confronted with the implausibility of some of his testimony and given an opportunity to explain. What's your answer to that, if anything? Your Honor, I believe my answer to that specific citation that my learned colleague gave the court was that I believe that was one question in reference to one particular issue having to do with Iman, if I'm not mistaken, or having to do with the ‑‑ I think it was having to do with Iman. Well, the length and the duration and the nature of the beating, he was pressed on that considerably. And why isn't that enough to satisfy Shannon Campos, given an opportunity to explain? Because, Your Honor, I would submit that when the I.J. made his finding in his oral decision, he made specific statements about the fact that the injury should not have been so serious or should have been more serious in light of the kind of beating that the applicant suffered. If the I.J. ‑‑ Let me direct your attention then to page 14 of the red brief. In his application, Petitioner stated that his father was tortured and threatened with jail unless Petitioner returned to Egypt. However, Petitioner testified he didn't know any of the details of his father's treatment and admitted that his father was not imprisoned, despite the fact that Petitioner did not return to Egypt. Is this a substantial discrepancy between the asylum application and the testimony? I don't believe so, Your Honor, because in the first place, the judge was putting the onerous burden upon the applicant to give specific facts and evidence of an event that occurred when the applicant was here in the United States. It's not a leap of faith for a trier of fact who has some basic knowledge of the situation in Egypt to know that if anybody's arrested in Egypt, they're not about to get on the phone and explain to their son, oh, by the way, this and this happened, and specifically I was taken to state security and they, you know, they beat me completely. I just think, Your Honor, that this I.J. just did not have a good grasp of country conditions in Egypt, and I think that prejudiced Mr. Yousef. I hope that addressed Your Honor's question. Thank you. I thank both counsel for the argument. The case just argued is submitted. Thank you. The next case on the calendar for argument today is Centner v. Stout.
judges: Trott, Clifton, Callahan